# 24-1343

## United States Court of Appeals for the Second Circuit

---

COUNCIL FOR RESPONSIBLE NUTRITION,

*Plaintiff-Appellant*,

v.

LETITIA JAMES, in her official capacity as New York Attorney General,

*Defendant-Appellee.*

---

On Appeal from the United States District Court for the Southern District of New York

---

## BRIEF FOR APPELLEE

---

BARBARA D. UNDERWOOD
*Solicitor General*
ESTER MURDUKHAYEVA
*Deputy Solicitor General*
GRACE X. ZHOU
*Assistant Solicitor General*
*of Counsel*

LETITIA JAMES
*Attorney General*
*State of New York*
Attorney for Appellee
28 Liberty Street
New York, New York 10005
(212) 416-6160

Dated: August 7, 2024

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................iv

PRELIMINARY STATEMENT ............................................................ 1

ISSUES PRESENTED ......................................................................... 3

STATEMENT OF THE CASE .............................................................. 4

    A.   Legal Background ................................................................. 4

        1.   Federal regulation of dietary supplements ...................... 4

        2.   New York's law prohibiting the sale of weight-loss
             and muscle-building supplements to minors ................... 6

    B.   Procedural History .............................................................. 12

STANDARD OF REVIEW ................................................................. 16

SUMMARY OF ARGUMENT ............................................................ 16

ARGUMENT ................................................................................... 20

POINT I

    THE DISTRICT COURT CORRECTLY CONCLUDED THAT PLAINTIFF IS
    UNLIKELY TO SUCCEED ON THE MERITS OF ITS FIRST AMENDMENT
    CLAIM ......................................................................................... 21

    A.   New York's Prohibition on the Sale of Weight-Loss and
        Muscle-Building Supplements to Minors Regulates
        Economic Conduct, Not Speech. ......................................... 22

    B.   Alternatively, New York's Prohibition on the Sale of
        Weight-Loss and Muscle-Building Supplements to
        Minors Is a Valid Regulation of Commercial Speech............. 30

i

**Page**

1.  The State has a substantial interest in protecting public health, particularly the physical and psychological well-being of minors. ................................. 31

2.  Prohibiting the sale of weight-loss and muscle-building supplements to minors directly advances the State's substantial interests..................................... 32

3.  The challenged statute is appropriately tailored............ 40

C.  Plaintiff's Challenge to the Statute's Age Verification Requirement Is Unpreserved and Unavailing. ...................... 46

POINT II

PLAINTIFF'S APPEAL FROM THE DENIAL OF A PRELIMINARY INJUNCTION BASED ON ITS DISMISSED CONSTITUTIONAL CLAIMS IS MOOT AND MERITLESS............................................................. 49

A.  Plaintiff's Appeal Is Moot with Respect to the Denial of Preliminary Injunctive Relief Based on Claims That Were Subsequently Dismissed. ............................................. 49

B.  The District Court Correctly Concluded That Plaintiff Is Unlikely to Succeed on the Merits of Its Now-Dismissed Constitutional Claims............................................................ 51

1.  New York's restriction on the sale of weight-loss and muscle-building supplements to minors is not unconstitutionally vague. ................................................. 51

2.  New York's sales restriction is not preempted by federal law governing product labeling............................ 59

**Page**

3. The State acted well within its police powers by restricting the sale of weight-loss and muscle-building supplements to minors. .................................... 62

POINT III

THE DISTRICT COURT CORRECTLY CONCLUDED THAT THE EQUITIES AND PUBLIC INTEREST ALSO WEIGH AGAINST GRANTING PRELIMINARY RELIEF ................................................................ 63

A. Plaintiff Cannot Prove Any Irreparable Harm. .................... 63

B. The Balance of Equities and Public Interest Weigh Decisively Against Granting Preliminary Relief. ................. 66

CONCLUSION ........................................................................ 67

# TABLE OF AUTHORITIES

**Cases**                                                                       **Page(s)**

*1256 Hertel Ave. Assocs., LLC v. Calloway,*
761 F.3d 252 (2d Cir. 2014) ............................................................ 56

*Arizona Free Enter. Club's Freedom Club PAC v. Bennett,*
564 U.S. 721 (2011) ...................................................................... 29

*B&L Prods., Inc. v. Newsom,*
104 F.4th 108 (9th Cir. 2024) ........................................................ 22

*Bad Frog Brewery, Inc. v. New York State Liquor Auth.,*
134 F.3d 87 (2d Cir. 1998) ...................................................... 33, 38

*Bates v. State Bar of Ariz.,*
433 U.S. 350 (1977) ...................................................................... 21

*Board of Trs. of State Univ. of N.Y. v. Fox,*
492 U.S. 469 (1989) ........................................................... 21, 40, 44

*Bronx Household of Faith v. Board of Educ. of City of N.Y.,*
331 F.3d 342 (2d Cir. 2003) ............................................................ 64

*Central Hudson Gas & Elec. Corp. v. Public Servs. Comm'n,*
447 U.S. 557 (1980) ...................................................................... 13

*Centro de la Comunidad Hispana de Locust Valley v. Town of*
*Oyster Bay,*
868 F.3d 104 (2d Cir. 2017) ........................................................ 26-27

*Chamber of Com. of U.S. v. Whiting,*
563 US. 582 (2011) ...................................................................... 59

*Citibank, N.A. v. Citytrust,*
756 F.2d 273 (2d Cir. 1985) ............................................................ 65

*Citizens Accord, Inc. v. Town of Rochester,*
235 F.3d 126 (2d Cir. 2000) ............................................................ 50

iv

| **Cases** | **Page(s)** |
|---|---|

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
  596 U.S. 61 (2022) ................................................................ 24

*City of Chicago v. Morales,*
  527 U.S. 41 (1999) ................................................................ 57

*Clear Channel Outdoor, Inc. v. City of N.Y.,*
  594 F.3d 94 (2d Cir. 2010) ........................................... 40, 43

*Clementine Co. v. Adams,*
  74 F.4th 77 (2d Cir. 2023) ................................................... 23

*Cornelio v. Connecticut,*
  32 F.4th 160 (2d Cir. 2022) ................................................. 30

*Coscarelli v. ESquared Hosp. LLC,*
  364 F. Supp. 3d 207 (S.D.N.Y. 2019) ................................... 65

*Council for Responsible Nutrition v. James,*
  No. 24-cv-1881, 2024 WL 2137834 (S.D.N.Y. May 13, 2024) ........ 15, 49

*Dachauer v. NBTY, Inc.,*
  913 F.3d 844 (9th Cir. 2019) ............................................... 60

*DiCroce v. McNeil Nutritionals, LLC,*
  82 F.4th 35 (1st Cir. 2023) .................................................. 60

*Doherty v. Bice,*
  101 F.4th 169 (2d Cir. 2024) ............................................... 46

*Expressions Hair Design v. Schneiderman,*
  581 U.S. 37 (2017) ................................................................ 22

*Ferrari v. Vitamin Shoppe Indus. LLC,*
  70 F.4th 64 (1st Cir. 2023) .................................................. 60

*Freedom Holdings, Inc. v. Spitzer,*
  408 F.3d 112 (2d Cir. 2005) ................................................ 65

| Cases | Page(s) |
|---|---|

*Ginsberg v. New York,*
    390 U.S. 629 (1968) ....................................................................... 32

*Grayned v. City of Rockford,*
    408 U.S. 104 (1972) ..................................................................57-58

*Honeyfund.com Inc. v. Governor,*
    94 F.4th 1272 (11th Cir. 2024) ...................................................26-27

*International Dairy Foods Ass'n v. Amestoy,*
    92 F.3d 67 (2d Cir. 1996) .................................................................. 63

*Jacobson v. Massachusetts,*
    197 U.S. 11 (1905) ............................................................................. 62

*K.M. v. Adams,*
    No. 20-4128, 2022 WL 4352040 (2d Cir. Aug. 31, 2022) .................. 50

*Kolender v. Lawson,*
    461 U.S. 352 (1983) ................................................................52, 56-57

*Lorillard Tobacco Co. v. Reilly,*
    533 U.S. 525 (2001) ...................................................... 23, 33, 41-42

*Marentette v. Abbott Lab'ys, Inc.,*
    886 F.3d 112 (2d Cir. 2018) .............................................................. 62

*Maryland v. King,*
    567 U.S. 1301 (2012) ........................................................................ 66

*Molloy v. Metropolitan Transp. Auth.,*
    94 F.3d 808 (2d Cir. 1996) ............................................................... 64

*Moody v. NetChoice, LLC,*
    144 S. Ct. 2383 (2024) ...................................................................... 44

*National Ass'n of Tobacco Outlets, Inc. v. City of Providence,*
    731 F.3d 71 (1st Cir. 2013) ............................................................... 22

vi

| Cases | Page(s) |
|---|---|

*National Inst. of Fam. & Life Advocs. v. Becerra,*
585 U.S. 755 (2018)................................................................ 48

*NetChoice, LLC v. Paxton,*
142 S. Ct. 1715 (2022)........................................................... 66

*New York Progress & Prot. PAC v. Walsh,*
733 F.3d 483 (2d Cir. 2013) .................................................. 16

*New York State Rest. Ass'n v. New York City Bd. of Health,*
556 F.3d 114 (2d Cir. 2009) .................................................. 59

*Nicopure Labs, LLC v. Food & Drug Admin.,*
944 F.3d 267 (D.C. Cir. 2019) .............................................. 22

*Ohralik v. Ohio State Bar Ass'n,*
436 U.S. 447 (1978) ............................................................... 21

*Oneok, Inc. v. Learjet, Inc.,*
575 U.S. 373 (2015)............................................................... 61

*Parker v. Levy,*
417 U.S. 733 (1974)..........................................................43-44

*People v. Aleynikov,*
31 N.Y.3d 383 (2018) ............................................................ 54

*Pierce v. Woldenberg,*
498 F. App'x 96 (2d Cir. 2012) ............................................. 50

*Resource Grp. Int'l Ltd. v. Chishti,*
91 F.4th 107 (2d Cir. 2024)................................................... 16

*Rubin v. Coors Brewing Co.,*
514 U.S. 476 (1995).........................................................23, 31

*Ruby v. Pan Am. World Airways, Inc.,*
360 F.2d 691 (2d Cir. 1966) .................................................. 50

| Cases | Page(s) |
|---|---|

*Rumsfeld v. Forum for Acad. & Inst. Rts., Inc.*,
547 U.S. 47 (2006)..........................................................23-25

*Silber v. Barbara's Bakery, Inc.*,
950 F. Supp. 2d 432 (E.D.N.Y. 2013)............................. 65

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
502 U.S. 105 (1991)......................................................29-30

*Smith v. United States*,
508 U.S. 223 (1993)............................................................ 54

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011)............................................................ 22

*Sussman v. Crawford*,
488 F.3d 136 (2d Cir. 2007) ............................................. 20

*Thibodeau v. Portuondo*,
486 F.3d 61 (2d Cir. 2007) ............................................... 52

*United States v. Antzoulatos*,
962 F.2d 720 ....................................................................... 22

*United States v. Article Consisting of 216 Individually Cartoned Bottles*,
409 F.2d 734 (2d Cir. 1969) ............................................. 25

*United States v. Caronia*,
703 F.3d 149 (2d. Cir. 2012) ................... 23, 31-32, 38-39, 45

*United States v. Edge Broad. Co.*,
509 U.S. 418 (1993).......................................................... 45

*United States v. Sun & Sand Imps., Ltd.*,
725 F.2d 184 (2d Cir. 1984) ............................................. 58

**Cases**                                                                    **Page(s)**

*Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
    455 U.S. 489 (1982) ................................................ 21, 51, 55

*Vugo, Inc. v. City of N.Y.*,
    931 F.3d 42 (2d Cir. 2019) ................................ 30-33, 36, 40

*We The Patriots USA, Inc. v. Hochul*,
    17 F.4th 266 (2d Cir. 2021) ............................................ 20

*Yates v. United States*,
    574 U.S. 528 (2015) ....................................................... 55

*Zauderer v. Office of Disciplinary Couns.*,
    471 U.S. 626 (1985) ................................................... 47-48

**Statutes**

*Federal*

21 U.S.C.
    § 301 et seq. ................................................................... 5
    § 321 ..................................................... 4, 9, 25, 55
    § 343 ............................................................................ 5
    § 343-1 ......................................................... 6, 59, 60
    § 830 .......................................................................... 48
    § 863 .......................................................................... 26

Dietary Supplement Health and Education Act of 1994,
    Pub. L. No. 103-417, 108 Stat. 4325 ............................... 4

*New York*

Ch. 558, 2023 McKinney's N.Y. Laws 1291 ............................. 8

Alcoholic Beverage Control Law
    § 65 ........................................................................... 48
    § 65-d ........................................................................ 48

ix

**Statutes**                                                   **Page(s)**

*New York*

General Business Law
    § 391-oo ............................................................... passim
    § 831 ......................................................................... 9

Public Health Law § 1399-cc .................................................... 48

**Regulations**

16 C.F.R. § 1500.18 ........................................................... 26

21 C.F.R.
    pt. 101 ........................................................................ 5
    pt. 111 ........................................................................ 5
    § 101.18 ..................................................................... 58
    § 201.128 ................................................................... 25

**Miscellaneous Authorities**

A. 431-C, 245th Sess. (N.Y. 2022) ............................................. 8

11A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2948.1 (3d ed., June 2024 update) .................................. 64

*FDA 101: Dietary Supplements*, U.S. Food and Drug Admin. (June 2, 2022), https://www.fda.gov/consumers/consumer-updates/fda-101-dietary-supplements (last visited Aug. 7, 2024) .............................................. 4-6

*Merriam-Webster's Collegiate Dictionary* (11th ed. 2003) ...................... 54

Veto Message to A. 431-C, Veto No. 122 (N.Y. Dec. 23, 2022) ........... 8, 45

## PRELIMINARY STATEMENT

In October 2023, New York State enacted a law prohibiting the sale of weight-loss and muscle-building supplements to minors and requiring sellers to verify the age of purchasers of such products. *See* N.Y. Gen. Bus. Law § 391-oo. Five months later, plaintiff Council for Responsible Nutrition (CRN) brought this facial constitutional challenge to the statute and moved for a preliminary injunction less than three weeks before the law was scheduled to take effect. The U.S. District Court for the Southern District of New York (Carter, J.) denied plaintiff's motion for a preliminary injunction. This Court should affirm.

*First*, the district court correctly held that CRN is unlikely to succeed on the merits of its facial First Amendment claim. The challenged law bars the sale of weight-loss and muscle-building supplements to minors but does not restrict what manufacturers and retailers may say about these products. The law thus regulates nonexpressive economic conduct and does not implicate the First Amendment. Although the law looks to manufacturers' and retailers' representations about the purposes of products to determine whether a given supplement is subject to the sale

restriction, this sorting function does not target the underlying speech but rather identifies the products falling within the scope of the restriction.

In any event, even if the law were construed as a regulation of commercial speech, it would be consistent with the First Amendment. The State's interest in protecting the public health, and that of minors in particular, is substantial, and ample scientific and anecdotal evidence supports the Legislature's conclusion that the physical and psychological well-being of minors is threatened by the ready and unregulated availability of weight-loss and muscle-building supplements. The State's sales restriction is an effective and reasonable means of redressing these harms because it prevents minors' unsupervised access to these products while leaving manufacturers and retailers free to sell and to advertise their products as they see fit.

*Second*, the Court need not—and should not—consider whether the district court properly denied CRN's motion for a preliminary injunction with respect to its claims that the challenged law is impermissibly vague, is preempted by federal law, and exceeds the State's police powers. Following the denial of the preliminary injunction motion, the district court dismissed each of these claims for failure to state a claim. CRN's

appeal from the denial of a preliminary injunction based on these dismissed claims is thus moot. Alternatively, this Court may readily affirm the district court's conclusion that CRN failed to establish a likelihood of success on the merits of any of these claims.

*Finally*, the district court properly held that the remaining preliminary injunction factors weigh in favor of the State. Among other things, CRN's inexplicable delay in seeking injunctive relief fatally undermines any assertion of irreparable injury. By contrast, the harm to the public interest of a preliminary injunction is substantial: a stay of the State's ability to enforce the challenged law will deprive New Yorkers of the critical safeguards that currently limit minors' access to these largely unregulated and potentially harmful products.

## ISSUES PRESENTED

1. Whether the district court properly concluded that plaintiff failed to establish a likelihood of success on its First Amendment challenge to New York's prohibition on the sale of weight-loss and muscle-building supplements to minors.

2. Whether plaintiff's appeal from the denial of a preliminary injunction based on its claims that the challenged law is vague, preempted,

and exceeds the State's police powers is moot, or in the alternative, whether the district court correctly concluded that plaintiff is unlikely to prevail on the merits of any of these constitutional challenges.

3. Whether the district court properly concluded that the absence of any irreparable injury to plaintiff, the balance of equities, and the public interest weigh decisively against granting preliminary relief.

## STATEMENT OF THE CASE

### A. Legal Background

### 1. Federal regulation of dietary supplements

Unlike drugs, dietary supplements—i.e., products containing ingredients such as vitamins, minerals, and herbs[1]—are not subject to review or approval by the U.S. Food and Drug Administration (FDA) before they are sold to the public. *See FDA 101: Dietary Supple-*

---

[1] Federal law defines "dietary supplement" as "a product . . . intended to supplement the diet" that contains, inter alia, vitamins, minerals, herbs or other botanicals, and amino acids. *See* Dietary Supplement Health and Education Act of 1994 (DSHEA), Pub. L. No. 103-417, § 3, 108 Stat. 4325, 4327 (codified at 21 U.S.C. § 321(ff)). Dietary supplements must be "intended for ingestion." 21 U.S.C. § 321(ff)(2)(A)(i). And they exclude products "represented for use as a conventional food or as a sole item of a meal or diet." *Id.* § 321(ff)(2)(B).

4

*ments*, U.S. Food and Drug Admin. (June 2, 2022).[2] Instead, the Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 301 et seq., as amended by the DSHEA, and the FDA's implementing regulations require companies themselves to ensure that their products meet federal safety and labeling requirements. *See FDA 101*, *supra*; *see also, e.g.*, 21 C.F.R. pt. 111 (setting forth good manufacturing practices for dietary supplements); 21 U.S.C. §§ 343(q)(5)(F), (r) (setting forth labeling requirements); 21 C.F.R. pt. 101 (same).

For example, while federal law requires dietary supplement manufacturers to have "substantiation" that any statement they make about the intended effect of a product on the "structure or function" of the human body is "truthful and not misleading," 21 U.S.C. § 343(r)(6)(A)-(B), the law nonetheless requires that any such structure/function claim be accompanied by a disclaimer on the product's label stating that the claim has not been evaluated by the FDA, *id.* § 343(r)(6)(C). To ensure that these labeling requirements remain uniform, the FDCA expressly preempts States from establishing "any requirement respecting"

---

[2] Available at https://www.fda.gov/consumers/consumer-updates/fda-101-dietary-supplements (last visited Aug. 7, 2024).

structure/function claims "that is not identical to the requirement of section 343(r)." *Id.* § 343-1(a)(5).

As the required disclaimer reflects, the FDA does not evaluate the safety or efficacy of dietary supplements before they are sold. Rather, the FDA's regulatory role "primarily begins after the product enters the marketplace." *FDA 101*, *supra*. The agency, for example, periodically inspects manufacturing facilities and reviews dietary supplement labels to verify compliance with federal requirements. *See id.* If a product is deemed to be mislabeled or unsafe, the FDA may work with the violator to bring the product into compliance or take legal action to remove the product from the marketplace. *See id.* Given this limited role, the FDA advises the public to "talk with a health care professional" before "buying or taking a dietary supplement" and urges consumers to report adverse reactions to assist the agency in identifying potentially dangerous products. *Id.*

### 2. New York's law prohibiting the sale of weight-loss and muscle-building supplements to minors

Since 2020, members of the New York Legislature have sought to address the unsupervised use by minors of dietary supplements for weight

loss and muscle gain. (*See* Joint Appendix (JA-) 86, 97-98.) The Legislature was concerned about the safety of these products, which "have been linked to outbreaks of liver damage . . . and have even caused several high-profile deaths in recent years" across all ages. (JA-94.) And the Legislature was equally motivated to act by the demonstrated link between the use of these supplements and another "serious public health problem" among the general public, and for youth in particular: eating disorders. (*See* JA-93–94.) As the Legislature explained, "the use of pills or powders to lose weight or build muscle, which are often sold as dietary supplements" is one of several "unhealthy weight control behaviors" commonly associated with eating disorders. (JA-94.) The Legislature thus sought to implement "an age-based restriction on sales"—modeled after existing restrictions on alcohol and tobacco—to "draw attention to the health risks of using these products and to reduce the incidence of use among youth." (JA-94, 98.)

In 2022, the Legislature passed the predecessor to the challenged statute, which similarly sought to prohibit the sale of over-the-counter diet pills and dietary supplements for weight loss or muscle building to youth under age eighteen and tasked the New York Department of

Health (DOH) with compiling a list of age-restricted products. *See* A. 431-C §§ 1, 2, 245th Sess. (N.Y. 2022). Governor Kathy Hochul vetoed the bill, explaining that "DOH is not equipped to create a list of restricted products," which would require expertise "to analyze ingredients used in countless products, a role that is traditionally played by the FDA." Veto Message to A. 431-C, Veto No. 122 (N.Y. Dec. 23, 2022).

On October 25, 2023, after several rounds of revisions, the Legislature passed, and the Governor signed into law, Assembly Bill No. 5610-D, the subject of this action. *See* Ch. 558, 2023 McKinney's N.Y. Laws 1291 (codified at N.Y. Gen. Bus. Law (GBL) § 391-oo). Consistent with the earlier version of the legislation, the enacted statute prohibits any person or company from selling or offering to sell "an over-the-counter diet pill or dietary supplement for weight loss or muscle building within [New York] to any person under eighteen years of age." GBL § 391-oo(2). Unlike its predecessor, however, the statute defines "dietary supplements for weight loss or muscle building" to include any product

8

in "a class of dietary supplement as defined in [GBL § 391-oo][3] that is labeled, marketed, or otherwise represented for the purpose of achieving weight loss or muscle building." *Id.* § 391-oo(1)(a).

As the Legislature explained, this approach accounts for the fact that weight-loss and muscle-building products "often contain unlisted, illegal pharmaceutical ingredients" and pose "serious health and mental health risks" regardless of their exact composition or efficacy. (JA-94.) The law thus limits minors' access to all products that manufacturers and retailers identify as aiding weight loss or muscle gain "rather than relying on a list of covered ingredients that the industry will soon work around." (JA-94.)

GBL § 391-oo contains several provisions further clarifying the scope of covered products. For example, the statute expressly exempts "protein powders, protein drinks and foods marketed as containing protein" from the age restriction unless that product also "contains an ingredient other

---

[3] The definition of "dietary supplement" under GBL § 391-o (renumbered to GBL § 831) mirrors the federal definition and also requires that a qualifying product be "labeled as a 'dietary supplement'" pursuant to federal law. *Compare* GBL § 831, *with* 21 U.S.C. § 321(ff)(1), (2)(A)(i).

than protein which would, considered alone, constitute a dietary supplement for weight loss or muscle building." GBL § 391-oo(1)(a).

Section 391-oo(6) also provides several nonexclusive factors "the court shall consider" when "determining whether an over-the-counter diet pill or dietary supplement is labeled, marketed, or otherwise represented for the purpose of achieving weight loss or muscle building." Specifically, the statute provides that a product may fall under the statutory definition of a "dietary supplement[] for weight loss or muscle building," *id.* § 391-oo(1)(a), if the "product's labeling or marketing bears statements or images that express or imply that the product will help" to (i) "modify, maintain, or reduce body weight, fat, appetite, overall metabolism, or the process by which nutrients are metabolized," or (ii) "maintain or increase muscle or strength," *id.* § 391-oo(6)(b).

The statute also specifies that a product's ingredients can trigger the age restriction if it contains an ingredient approved by the FDA "for weight loss or muscle building," a steroid, or other ingredients commonly appearing in weight-loss or muscle-building supplements, such as "creatine, green tea extract, raspberry ketone, garcinia cambogia, green coffee bean extract." *Id.* § 391-oo(6)(a). And the statute further provides

10

that a retailer's actions can bring a product within the statute's scope of enforcement by, inter alia, "placing signs, categorizing, or tagging the supplement with statements" that suggest the supplement will help achieve weight loss or muscle gain, or by "grouping the supplements with other weight loss or muscle building products in a display, advertisement, webpage, or area of the store." *Id.* § 391-oo(6)(d).

GBL § 391-oo also contains provisions governing how retailers must comply with the age-based sales restriction. The statute requires brick-and-mortar retailers who directly sell covered products to the public to obtain "proof of legal age" by means of a driver's license or other types of identification at the point of sale. *Id.* § 391-oo(2). And the statute requires online retailers and other retailers who ship covered products to use a method of mailing that requires proof that "the person who signs to accept delivery of the shipping container" is at least eighteen years of age. *Id.* § 391-oo(4)(b).

Finally, the statute authorizes the New York Attorney General to enforce these requirements through special proceedings in state court after giving notice to alleged offenders. *See id.* § 391-oo(5). If a court finds a violation after considering the factors set forth in § 391-oo(6) and any

11

defenses asserted by the alleged violator, *see id.* § 391-oo(3)(c), the court may impose a civil penalty of no more than $500 per violation and issue an injunction restraining any further violations, *id.* § 391-oo(5).

## B.   Procedural History

Plaintiff-appellant Council for Responsible Nutrition (CRN) is a trade association representing dietary supplement manufacturers and ingredient suppliers. (JA-125.) On March 13, 2024—five months after GBL § 391-oo was enacted—CRN brought this lawsuit under 42 U.S.C. § 1983 seeking a declaration that the statute is facially invalid and an injunction barring the New York Attorney General from enforcing it. (JA-2, 161–168, 172.) CRN contended that the law (i) is an impermissible restriction of commercial speech under the First Amendment; (ii) is void for vagueness; (iii) exceeds the State's police powers, and (iv) is preempted by the FDCA. (JA-162–168.)

Three weeks later, and just before the law was scheduled to take effect on April 22, 2024, CRN moved for a temporary restraining order and preliminary injunction against enforcement of the law. (JA-9–10.) The district court denied the application for a temporary restraining order, and following briefing, argument, and supplemental briefing, issued

a thorough opinion and order denying the motion for a preliminary injunction. (JA-174–198.)

*First*, the district court concluded that CRN was unlikely to succeed on the merits of its First Amendment challenge. As the court explained, the challenged sales restriction does not implicate protected speech interests because it regulates only sellers' conduct and not "what these sellers may or may not say" about their products. (*See* JA-186 (quotation marks omitted).) The court further concluded that, even if the sales restriction were construed as a regulation of commercial speech, the law would survive intermediate scrutiny under the test set forth in *Central Hudson Gas & Electric Corp. v. Public Services Commission*, 447 U.S. 557, 566 (1980). (JA-187–191.)

Specifically, the court concluded that "ample evidence in the legislative record and public health discourse" establishes that prohibiting the sale of weight-loss and muscle-building supplements to minors "directly and materially advances" the State's interest in protecting children from the "prevalence of eating disorders and the health harms from the unregulated use of dietary supplements." (*See* JA-188.) And the court further concluded that the restrictions are appropriately tailored

13

because the statute "leaves open alternative avenues for vendors to convey information about products." (JA-191 (quotation marks omitted).)

*Second*, the district court likewise found that CRN was unlikely to succeed on the merits of its remaining constitutional challenges. (*See* JA-191–194.) Among other things, the court rejected CRN's claim that GBL § 391-oo exceeds the State's police powers. As the court explained, challenges to the State's exercise of its police powers "are reviewed for reasonableness," and, here, the statute "easily satisfies rational basis review." (JA-191–192.) The court also rejected CRN's vagueness challenge, finding that "the plain language of the Statute is uncompromisingly clear" about the core conduct the law prohibits: the sale of weight-loss or muscle-building supplements to minors. (JA-193.) And the court found "no basis for preemption" by the federal laws governing the labeling of dietary supplements given that the state statute "does not mandate any alterations to the labeling of dietary products." (JA-192–193.)

*Finally*, the court concluded that the remaining preliminary injunction factors weigh decisively against granting preliminary relief. (JA-194–197.) In particular, the court found that CRN's "substantial and inexcusable delay in moving for preliminary relief . . . erodes its claims of

14

immediate, irreparable, and impending injury." (JA-195.) And the court further concluded that "CRN's pecuniary interests, fear of the enforcement of civil penalties, and speculative loss of revenue and sales pale in comparison to the State's goal of protecting youth" from the harms associated with unfettered access to weight-loss and muscle-building supplements. (JA-197.) The court thus held that "it would be unquestionably against the public interest to impede enforcement of N.Y. Gen. Bus. Law § 391-oo." (JA-197.)

Following this decision, the district court denied CRN's motion for "clarification" of the opinion (JA-200), and granted the Attorney General's motion to dismiss the complaint in part, *see Council for Responsible Nutrition v. James*, No. 24-cv-1881, 2024 WL 2137834, at *3-4 (S.D.N.Y. May 13, 2024). Specifically, the court dismissed all of CRN's claims except its First Amendment challenge for failure to state a claim. *Id.* at *4. The next day—nearly one month after GBL § 391-oo had gone into effect—CRN filed this appeal, challenging the district court's denial of preliminary relief. (JA-201.)

15

## STANDARD OF REVIEW

This Court reviews the district court's denial of a preliminary injunction for abuse of discretion. *See Resource Grp. Int'l Ltd. v. Chishti*, 91 F.4th 107, 114 (2d Cir. 2024). An abuse occurs "when the district court bases its ruling on an incorrect legal standard or on a clearly erroneous assessment of the facts." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013) (quoting *Bronx Household of Faith v. Board of Educ. of City of N.Y.*, 331 F.3d 342, 348 (2d Cir. 2003)).

## SUMMARY OF ARGUMENT

The Court should affirm the district court's denial of a preliminary injunction.

I. The district court correctly concluded that CRN is unlikely to succeed on the merits of its First Amendment claim—the only claim that is properly before this Court given the district court's subsequent dismissal of CRN's remaining claims, which moots the portions of CRN's appeal based on those claims.

As threshold matter, GBL § 391-oo does not implicate the First Amendment because the law regulates solely nonexpressive economic conduct. The law dictates what retailers must do—refrain from selling

16

weight-loss and muscle-building supplements to minors—and not what businesses may or may not say. This sales restriction thus follows in the established tradition of economic conduct regulations, such as price restrictions and sales bans, which courts have found do not implicate the First Amendment. To be sure, the law relies on manufacturers' and retailers' own descriptions of their products' characteristics and effects in order to identify which products aid weight loss or muscle building. However, this fact alone is insufficient to trigger First Amendment scrutiny as it is well established that a regulation can be deemed to regulate only conduct even if the conduct is initiated or evidenced by speech.

In any event, the district court correctly concluded in the alternative that the law would survive intermediate scrutiny under *Central Hudson* even if the law were deemed a regulation of commercial speech. Binding precedent confirms that the State's asserted interest in GBL § 391-oo— to safeguard the public health, and that of minors, in particular—is substantial. Multiple scientific studies, letters from public health experts and organizations, and anecdotal accounts by youth and former dietary supplements sales associates all confirm that the use of weight-loss and

muscle-building supplements by minors is widespread and that these products are associated with a host of negative health outcomes, including liver damage, eating disorders, and body image issues. The sales restriction will clearly address these harms: by reducing minors' access to these products, the restriction will necessarily reduce exposure to the dangers associated with their use. Moreover, the law is appropriately tailored because it allows manufacturers and retailers ample alternative channels to advertise their products; indeed, aside from foreclosing the actual sale of weight-loss and muscle-building products to minors, GBL § 391-oo imposes no restrictions at all on their advertising, marketing, or labeling.

II. CRN's appeal from the denial of a preliminary injunction based on constitutional claims that the district court subsequently dismissed is plainly moot, and this Court can affirm the denial on that ground alone. Alternatively, this Court may affirm on the basis that the district court correctly held that CRN failed to show a likelihood of success on the merits of these claims.

For example, the district court correctly held that GBL § 391-oo is not impermissibly vague because the statute specifies what types of

18

actions and statements bring a product within the scope of the sales restriction and therefore provides the requisite "fair notice" and "minimal standards" for enforcement to satisfy due process. The district court also correctly found that GBL § 391-oo is not preempted by the FDCA because the law restricts sales rather than labeling. Finally, the district court correctly held that GBL § 391-oo is a lawful exercise of the State's police powers because it is reasonably related to the State's interest in promoting public health.

III. The district court properly held that the remaining preliminary injunction factors weigh strongly in favor of the State. As the district court correctly concluded, CRN's inexplicable five-month delay in seeking injunctive relief fatally undermines any claim of irreparable harm. By contrast, the harms to the public interest of an injunction are grave. CRN seeks to enjoin enforcement of a law whose express purpose and demonstrated effect is to protect minors from the dangers associated with the use of harmful weight-loss and muscle-building supplements.

19

## ARGUMENT

A "preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion." *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007) (quotation marks omitted). To carry that burden, "the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 279 (2d Cir.) (quotation marks omitted), *clarified by* 17 F.4th 368 (2d Cir. 2021).

Here, the district court correctly concluded that CRN failed to establish a likelihood of success on the merits of its facial constitutional challenges and was equally correct in holding that the equitable factors weigh decisively against the grant of preliminary relief. Accordingly, the district court's denial of a preliminary injunction against the enforcement of GBL § 391-oo should be affirmed.

## POINT I

### THE DISTRICT COURT CORRECTLY CONCLUDED THAT PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS OF ITS FIRST AMENDMENT CLAIM

The district court correctly concluded that CRN's facial First Amendment challenge lacks merit. (*See* JA-182–191.) As a threshold matter, the Supreme Court has repeatedly cautioned against permitting facial attacks on purported restrictions of commercial speech. *See Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 497 (1982) ("the overbreadth doctrine does not apply to commercial speech"); *see also Board of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 481 (1989); *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 462 n.20 (1978); *Bates v. State Bar of Ariz.*, 433 U.S. 350, 380-81 (1977).

But even assuming that CRN may proceed on its facial First Amendment challenge, the district court correctly determined that CRN is unlikely to succeed on the merits. As explained below, the State's prohibition on the sale of weight-loss and muscle-building supplements to minors does not implicate the First Amendment because the restriction clearly regulates nonexpressive economic conduct rather than speech. In

21

any event, the law would readily withstand constitutional scrutiny even if it were construed as a regulation of commercial speech.

## A. New York's Prohibition on the Sale of Weight-Loss and Muscle-Building Supplements to Minors Regulates Economic Conduct, Not Speech.

"[R]estrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011). Accordingly, courts have repeatedly observed that regulations of economic conduct—for example, price and sales restrictions—do not restrict expressive speech subject to First Amendment protections. *See, e.g.*, *Expressions Hair Design v. Schneiderman*, 581 U.S. 37, 47 (2017); *Nicopure Labs, LLC v. Food & Drug Admin.*, 944 F.3d 267, 290-91 (D.C. Cir. 2019); *National Ass'n of Tobacco Outlets, Inc. v. City of Providence*, 731 F.3d 71, 74, 78 (1st Cir. 2013).[4]

---

[4] *See also B&L Prods., Inc. v. Newsom*, 104 F.4th 108, 114 (9th Cir. 2024) ("[C]onsummating a business transaction is nonexpressive conduct unprotected by the First Amendment."); *United States v. Antzoulatos*, 962 F.2d 720. 726 (7th Cir. 1992) ("Regulation of economic activity, such as [the defendant's] ability to sell cars, simply does not implicate the First Amendment.").

Specifically, a requirement "regulates conduct, not speech" when it dictates what regulated entities "must *do*" and "not what they may or may not *say*." *Rumsfeld v. Forum for Acad. & Inst. Rts., Inc. ("FAIR")*, 547 U.S. 47, 60 (2006); *accord Clementine Co. v. Adams*, 74 F.4th 77, 86 (2d Cir. 2023) (citing *FAIR*). Here, the district court correctly determined that GBL § 391-oo regulates conduct rather than speech because it prohibits the sale of weight-loss and muscle-building supplements to minors and does not restrict the labeling or marketing of such products. (*See* JA-186.) Indeed, manufacturers and retailers of dietary supplements may continue to advertise—including to minors—that their products will help users lose weight or build muscle. And they may do so free from any state-imposed constraints, so long as they do not actually sell any weight-loss or muscle-building supplements to minors. This sales restriction is thus different in kind from advertising restrictions that courts have found to implicate the First Amendment. *Cf., e.g.*, *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 569 (2001) (ban on self-service tobacco displays); *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 485 (1995) (ban on beer labels displaying alcohol content); *United States v. Caronia*, 703 F.3d 149, 164-65 (2d. Cir. 2012) (ban on promoting drugs for off-label uses).

23

Contrary to CRN's argument (Appellant's Br. (Br.) at 24-25), the mere fact that a regulated entity (or a court) must examine a product's listed ingredients, packaging, or marketing to determine whether the product is intended to aid weight loss or muscle gain does not transform a restriction on the sale of these types of products to minors into a direct regulation of speech. As the Supreme Court has long recognized, "it has never been deemed an abridgment of freedom of speech . . . to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language." *FAIR*, 547 U.S. at 62 (quoting *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)); *cf. City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 73 (2022) (rejecting "view that *any* examination of speech or expression inherently triggers heightened First Amendment concern").

For example, Congress may "prohibit employers from discriminating in hiring on the basis of race" even though application of the law can be triggered by speech, such as "a sign reading 'White Applicants Only.'" *FAIR*, 547 U.S. at 62. Similarly, the Court in *FAIR* upheld a federal requirement that schools afford military recruiters equal access to the campus, even though the scope of the schools' required conduct and their

24

obligation to comply is likewise tied to their speech. *See id.* at 60-62. As the Court explained, equal access means that, if a school sends recruiting emails or notices on behalf of other recruiters, it must do the same on behalf of the military. *See id.* at 61. Notwithstanding the requirement's speech "trigger" (*see* Br. at 24), the Court held that it properly regulates "conduct, not speech," *see FAIR*, 547 U.S. at 60.

More to the point, laws and regulations often define the category of regulated product by reference to a manufacturer's or retailer's representations about a product. The FDCA, for example, defines "drug" to include any product "*intended for use* in the diagnosis, cure, mitigation, treatment, or prevention of disease." 21 U.S.C. § 321(g)(1) (emphasis added). A product's intended use may be evidenced by its "labeling claims" and "advertising." 21 C.F.R. § 201.128; *see also United States v. Article Consisting of 216 Individually Cartoned Bottles*, 409 F.2d 734, 739 (2d Cir. 1969) (courts may examine product's "promotional material, advertising and any other relevant source" to ascertain whether product's "intended use" qualifies it as a drug). Additionally, the federal Anti-Drug Abuse Act, which criminalizes the sale of drug paraphernalia, directs courts to examine "descriptive materials accompanying the item which

explain or depict its use;" "national and local advertising concerning its use;" and "the manner in which the item is displayed for sale." 21 U.S.C. § 863(e)(2)-(4). And, under the Consumer Product Safety Commission's regulations banning certain toys and articles intended for use by children, a prohibited "infant cushion" or "infant pillow" is "intended or promoted for use by children under one year of age." 16 C.F.R. § 1500.18(a)(16)(i)(E). CRN cannot seriously contend that these types of product regulations and sales restrictions—which likewise require examining the content of a manufacturer's or retailer's marketing—seek to directly regulate or burden certain forms of advertising or labeling.

CRN's cited authority (Br. at 24-26) is not contrary to the district court's determination. Both *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272 (11th Cir. 2024) and *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104 (2d Cir. 2017), involved First Amendment challenges to laws that had the express purpose and direct effect of prohibiting certain speech. The Florida law in *Honeyfund.com*, for example, barred employers from holding mandatory workplace meetings that endorsed diversity, equity, and inclusion principles, but permitted "sessions that reject these ideas or present them in an

'objective manner.'" 94 F.4th at 1275-76 (quoting Fla. Stat. § 760.10(8)(b)). The Eleventh Circuit held that this law did not merely regulate the conduct of "holding the mandatory meeting" because it clearly sought to restrict certain viewpoints. *Id.* at 1278. The town ordinance in *Centro de la Comunidad Hispana* similarly prohibited a specific category of speech: roadside solicitation of employment. *See* 868 F.3d at 112. These cases thus stand for the limited proposition that a purported restriction on conduct in fact regulates speech where "the conduct and the speech are so intertwined, [that] regulating the former means restricting the latter." *Honeyfund.com*, 94 F.4th at 1278.

In an effort to fit within the framework of *Honeyfund.com* and *Centro de la Comunidad Hispana*, CRN mischaracterizes GBL § 391-oo by arguing that the law seeks to "'target[]' dietary supplements 'based on their marketing.'" Br. at 27-28 (quoting JA-94). To the contrary, the Legislature made clear that the purpose of the law is to "prohibit the sale of these dangerous diet pills and dietary supplements to minors" and further explained that the best method of identifying this category of products is to examine "the way the products are marketed"—i.e., whether they "labeled, marketed, or otherwise represented for the purpose of

achieving weight loss or muscle building"—instead of "relying on a list of covered ingredients that industry will soon work around." (JA-94; *see* JA-93.) This statutory context demonstrates that GBL § 391-oo does not aim to suppress the advertising of weight-loss and muscle-building supplements, but rather, references manufacturers' and retailers' own descriptions of their products only to identify which supplements are subject to the law.

CRN and amici likewise miss the mark in asserting that the sales restriction triggers First Amendment scrutiny by purportedly imposing a content-based financial burden on manufacturers' and retailers' commercial speech.[5] *See* Br. at 32-34; Br. of Chamber of Com. et al. as Amici Curiae in Supp. of Appellant (Amicus Br.) at 9-12. GBL § 391-oo in no way penalizes manufacturers or retailers for advertising weight-loss or muscle-building supplements. CRN and amici's insistence to the contrary appears to stem from their misguided view that GBL § 391-oo's sales restriction is a penalty on advertising that manufacturers and retailers

---

[5] CRN did not make this argument in support of its motion for preliminary relief. (*See* Pl.'s Mem. of Law at 17-24, *Council for Responsible Nutrition v. James*, No. 1:24-cv-01881 (S.D.N.Y. Apr. 3, 2024), ECF No. 25.)

may avoid if they change their labeling and marketing. *See* Amicus Br. at 10 (arguing that manufacturers and retailers must choose between "subjecting their products to restrictions" or "not speaking accurately and persuasively about their products"); *see also* Br. at 33 (same). But there is no merit to CRN's contention that GBL § 391-oo discourages the dissemination of "truthful information" about a product's intended effect (Br. at 33), when the only reason that manufacturers or retailers would withhold this information would be to purposefully evade the law's age restriction so that they can continue selling their products to minors. Any such self-censorship to circumvent the law plainly does not implicate the First Amendment.

CRN and amici are similarly not aided (Br. at 32-33; Amicus Br. at 9-10) by their reliance on inapposite campaign finance, victim compensation, and sex-offender registration cases. These cases, which did not involve commercial speech, merely confirm that the government may not restrict disfavored speech by imposing financial or other obstacles on speakers who wish to engage in that speech. *See, e.g.*, *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 736 (2011) (matching funds provision discouraged campaign spending); *Simon & Schuster, Inc.*

*v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991) (Son of Sam law imposed "financial disincentive" on crime publicization); *Cornelio v. Connecticut*, 32 F.4th 160, 167, 169-70 (2d Cir. 2022) (disclosure requirement prevented sex offenders from engaging in anonymous online speech). These authorities do not support the proposition that any regulation of conduct that incidentally burdens speech by making it more expensive or more difficult warrants First Amendment scrutiny.

## B. Alternatively, New York's Prohibition on the Sale of Weight-Loss and Muscle-Building Supplements to Minors Is a Valid Regulation of Commercial Speech.

The district court correctly held, in the alternative, that GBL § 391-oo would comport with the First Amendment under the *Central Hudson* framework even if it were construed as a regulation of commercial speech.[6] (*See* JA-187–191.) *Central Hudson* requires the Court to consider "whether: (1) the speech restriction concerns lawful activity; (2) the

---

[6] CRN suggests in a footnote (*see* Br. at 34 n.10) that this Court could evaluate the challenge by applying strict scrutiny. CRN did not raise this argument below, and it is squarely foreclosed by this Court's decision in *Vugo, Inc. v. City of New York,* 931 F.3d 42 (2d Cir. 2019). There, the Court expressly reaffirmed that the *Central Hudson* test applies to commercial speech restrictions, including those that are content-based. *Id.* at 49-50.

[State's] asserted interest is substantial; (3) the prohibition 'directly advances' that interest; and (4) the prohibition is no more extensive than necessary to serve that interest." *Vugo, Inc. v. City of N.Y.,* 931 F.3d 42, 51 (2d Cir. 2019) (citing *Central Hudson*, 447 U.S. at 566). Contrary to CRN's argument (Br. at 32-44), GBL § 391-oo amply satisfies the three contested factors of this test.

### 1. The State has a substantial interest in protecting public health, particularly the physical and psychological well-being of minors.

As the district court correctly observed (JA-187), CRN conceded below that "the State has a substantial government interest in protecting public health." (*See* Pl.'s Mem. of Law at 19.) But even if the Court were to overlook this concession, the State's asserted interest here is clearly substantial. The goal of GBL § 391-oo is to protect the health of minors by limiting their access to weight-loss and muscle-building supplements— products whose use has been associated with eating disorders and has resulted in serious illness and even death. Courts have uniformly held that the government's interest "in protecting the health, safety, and welfare of its citizens" is substantial, *Rubin*, 514 U.S. at 485; *see Caronia*,

31

703 F.3d at 166, and is at its zenith when concerning vulnerable groups such as minors, *cf. Ginsberg v. New York*, 390 U.S. 629, 638-40 (1968).

CRN misses the mark in arguing that "the State has no interest at all" in purportedly "burdening accurate health information" and impeding individuals' ability "to exercise a meaningful choice concerning their individualized health needs." *See* Br. at 37 (quotation marks omitted). Under the second prong of *Central Hudson*, the Court must evaluate whether the State's "*asserted* goal in enacting the regulation" is substantial, *Vugo*, 931 F.3d at 51. Here, the State has consistently and credibly maintained that the goal of GBL § 391-oo is to protect the public health, and that of minors in particular, and binding precedent confirms that this interest is substantial. CRN's efforts to mischaracterize the State's interest have no bearing on the constitutional analysis. *See Vugo*, 931 F.3d at 51 (rejecting similar attempt to mischaracterize government interest).

### 2. Prohibiting the sale of weight-loss and muscle-building supplements to minors directly advances the State's substantial interests.

GBL § 391-oo likewise satisfies the third prong of *Central Hudson*, which requires the State to demonstrate that the "harms it recites are

real" and that the challenged sales restriction "will in fact alleviate them to a material degree," *Vugo*, 931 F.3d at 52 (quoting *Edenfield v. Fane*, 507 U.S. 761, 771 (1993)). To do so, the State must show that the restriction will provide more than "ineffective or remote support for the government's purpose" of safeguarding the public health. *See Bad Frog Brewery, Inc. v. New York State Liquor Auth.*, 134 F.3d 87, 98 (2d Cir. 1998) (quoting *Central Hudson*, 447 U.S. at 564). Although the State may not rely on "mere speculation or conjecture" to make this showing, *Lorillard*, 533 U.S. at 569 (quoting *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 188 (1999)), the Supreme Court has emphasized that "studies and anecdotes" and even "history, consensus, and 'simple common sense'" suffice, *id.* (quoting *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995)).

The district court correctly concluded that the State satisfied its burden here. (JA-188–189.) The record is replete with evidence of the dangers that weight-loss and muscle-building supplements pose to the public, in general, and to minors, in particular. A 2019 study in the *Journal of Adolescent Health*, for example, found that youth who consumed these products were three times more likely to suffer an

33

adverse medical event (such as hospitalization, emergency room visit, or even death) than youth who consumed ordinary vitamins. (JA-100, 108 (citing Flora Or et al., *Taking Stock of Dietary Supplements' Harmful Effects on Children, Adolescents, and Young Adults*, J. of Adolescent Health (June 2019).) Multiple studies have further confirmed that many of these products are "adulterated with banned substances, prescription drugs, stimulants, steroids and other toxic ingredients," and that their use has been linked to "organ failure, heart attacks, stroke, and death." (JA-108; *see also* JA-113 (reporting that several companies "have even been shut down due to having live and dead rodents along with traces of rodent urine and feces" in their products).)

The record also demonstrates the serious harms that weight-loss and muscle-building products inflict on youths' body image and mental health. Letters from Dr. Jason Nagata, a professor of pediatrics, and eighteen public health and advocacy organizations, cited numerous studies that have found the use of these products to be associated with body image issues, including eating disorders. (JA-100–101, 108-109.) One study, for example, concluded that adolescent and young adult women who use over-the-counter diet pills are six times more likely to be

34

diagnosed with an eating disorder within the next three years than non-users. (*See* JA-100; *see also* JA-108.) Another study found that young people who take muscle-building supplements are more likely to subsequently use illegal muscle-building drugs, such as anabolic steroids. (*See* JA-108.)

Anecdotal evidence further confirms the gravity of these harms. A high school student from Queens, New York, for instance, reported observing first-hand "the detrimental role" that "eating disorders and body d[y]smorphia play . . . in our classrooms and in the sporting fields," and attributed their prevalence to the "predatory supplements industry." (JA-106.) Dr. Nagata likewise represented that he has "cared for countless youth who have used weight loss or muscle-building supplements, developed eating disorders, become critically ill, and required hospitalization." (JA-108–109.) Indeed, the American Academy of Pediatrics has strongly cautioned against allowing children to use these types of supplements. (*See* JA-100, 108.) And many supplement brands themselves, including those of CRN's members, warn that these products are not suitable for use by minors. (JA-113; *see* JA-116 (warning that product is "[n]ot for use by children").)

35

The challenged sales restriction will plainly "alleviate [the above] harms to a material degree," *Vugo*, 931 F.3d at 52 (quotation marks omitted). Common sense dictates that limiting minors' *access* to weight-loss and muscle-building supplements will reduce their overall *use* of these products and exposure to the associated health harms. And limiting such access will raise general awareness of the health risks attendant to the unrestricted use of these products. Moreover, the State's experience regulating other harmful products confirms that sales restrictions are efficacious, when appropriately enforced. (*See* JA-98 (observing that "[a]ge restrictions have . . . reduce[d] alcohol and tobacco consumption in adolescents").)

CRN's contrary arguments are wholly unavailing. *First*, CRN wrongly contends that the State must demonstrate that restricting *the marketing* of dietary supplements "will 'in fact' address eating disorders in minors 'to a material degree.'" Br. at 38 (citation omitted); *see id.* at 40-41. That argument fundamentally misconstrues how GBL § 391-oo works. As explained above (at 23), GBL § 391-oo does not place any restrictions on how dietary supplements may be advertised. The law instead prohibits *the sale* of products that are identified as aiding weight

36

loss or muscle gain by, inter alia, their ingredients, labeling, or retail placement. Thus, to satisfy the third prong of *Central Hudson*, the State need only demonstrate that restricting the sale of this category of dietary supplements to minors will help address the various health harms to minors associated with their use, such as eating disorders. The State has amply done so here.

*Second*, CRN's quibbles (Br. at 39-40) with the State's evidence all miss the mark. CRN chiefly seeks to discredit the conclusions of Dr. Nagata. *See id.* But there is no basis to disregard his conclusions about the dangers of weight-loss and muscle-building supplements simply because CRN disagrees with his characterization of the scientific literature and seeks to advance the conclusions of its own study. *See id.* at 40 (citing JA-138 (¶ 77)). In any event, Dr. Nagata's conclusions were based not only on his survey of the scientific literature, but also on his experience as "a pediatrician specializing in adolescent eating disorders." (JA-108.) Such anecdotal evidence—in conjunction with the plethora of other evidence that the State has adduced (see *supra* at 33-35)—plainly suffices to show that the dangers of taking weight-loss and muscle-building

supplements are real and that restricting their purchase by youth will alleviate these health risks to a material degree.

*Third*, CRN incorrectly asserts (Br. at 41) that GBL § 391-oo fails to directly advance the State's goal because the law restricts the sale of weight-loss and muscle-building supplements without also banning their consumption. This Court has long emphasized that the State need not "attack a problem with a total effort" to satisfy *Central Hudson*'s third prong. *See Bad Frog Brewery*, 134 F.3d at 100. In any event, it is undisputed that the sales restriction will reduce minors' access to, and use of, these products—particularly their unsupervised use. Indeed, CRN's members precisely complain that the law will reduce their sales of these supplements, thereby harming their revenues. (*See, e.g.*, JA-29 (¶ 59) (pointing to "certainty of lost sales"); JA-56 (¶ 15) (attesting that law "will reduce the demand for contract manufacturing").

This case is thus patently distinguishable from *Caronia*, in which the federal government criminalized the promotion of drugs for off-label purposes while continuing to allow their prescription. *See* 703 F.3d at 167. The Court concluded that this advertising restriction did not advance the government's asserted goal of "reducing patient exposure to unsafe

38

and ineffective drugs" because patients could still access drugs for off-label purposes and because the prohibition in fact undermined "the ability of physicians and patients to receive potentially relevant treatment information." *Id.* at 166. No such circumstances are present here. GBL § 391-oo directly regulates the sale (and not advertising) of weight-loss and muscle-building supplements to minors and, in so doing, effectively reduces minors' unsupervised access to these products.

*Fourth*, there is no merit to CRN's contention (Br. at 41-42) that the sales restriction is impermissibly over- and- underinclusive. CRN's assertion that the law is overinclusive is an argument about the law's tailoring—not whether it materially advances the State's interests—and fails for the reasons below (at 43-44). CRN's argument that the law is underinclusive is likewise meritless. CRN claims (Br. at 42) that manufacturers and retailers can circumvent the sales restriction by simply altering their marketing. But the possibility that some bad actors may attempt to willfully evade the law by obfuscating the intended effect of their products does not render the restriction itself fatally underinclusive. As this Court explained in *Vugo*, underinclusiveness is a problem *if* it gives rise to "doubts about whether the government is in fact pursing the

interest it invokes, rather than disfavoring a particular speaker or viewpoint." 931 F.3d at 53 (quotation marks omitted). CRN's hypothetical scenario here raises no such concerns about pretext.

### 3. The challenged statute is appropriately tailored.

Under the final *Central Hudson* factor, the State must establish that "the regulation [does] not burden substantially more speech than is necessary to further the government's legitimate interests." *Clear Channel Outdoor, Inc. v. City of N.Y.*, 594 F.3d 94, 104 (2d Cir. 2010) (quoting *Fox*, 492 U.S. at 478). That showing is "considered, somewhat in tandem," with the State's evidence of harm, *Vugo*, 931 F.3d at 52 (quotation marks omitted), and requires "a 'fit' between the legislature's ends and the means chosen to accomplish those ends, . . . that is not necessarily perfect, but reasonable," *Fox*, 492 U.S. at 480 (citation and quotation marks omitted).

Here, the record evidence clearly demonstrates a "reasonable" fit between the sales restriction and the State's goal of protecting the health of minors. Indeed, the restriction is justified by not only the severity of the health harms associated with the use of weight-loss and muscle-building supplements (see *supra* at 33-35), but also by the magnitude of

40

the problem and the inability of industry to self-regulate. As Dr. Nagata and the public health and advocacy organizations reported, youth are "prominent consumers" of weight-loss and muscle-building supplements, which generate over $2.5 billion in annual revenue. (JA-108; *see* JA-100.)

Anecdotal evidence further confirms that the use of these products is widespread and fueled by the industry. For example, Ryan A., a high school student, wrote that certain manufacturers have "sponsored athletes at [his] high school" in order to directly target adolescents. (*See* JA-106.) Three former sales associates at prominent dietary supplement companies (GNC and PERFORMIX) have likewise reported that they were "astonished by the number of adolescents from as young as 12," who visited their stores in search of these products, and recounted that they "would often get in trouble" for "denying minors from buying these products" because it caused "a decrease in sales revenue." (JA-113.)

Moreover, the challenged law "leave[s] open ample channels of communication," *Lorillard Tobacco Co.*, 533 U.S. at 569, further confirming that its scope is appropriately drawn. CRN's members may continue to advertise the purported weight-loss or muscle-building functions associated with a supplement so long as they do not sell that

41

product to minors in New York State. CRN's members are also free to share any information about these age-restricted products—including their view that these products are appropriate for minors—through any media (in person, in print, or online). Thus, the only "channel" that the sales restriction forecloses is the *actual sale* of weight-loss and muscle-building supplements to a discrete subset of the population: youth under the age of eighteen.

The Supreme Court upheld a far more sweeping restriction in *Lorillard*, 533 U.S. at 569-70. There, Massachusetts not only age-restricted tobacco products but also mandated that they be displayed in locations accessible only by salespersons and prohibited all self-service displays. *Id.* at 567. Although the tobacco sellers asserted "a cognizable speech interest in a particular means of displaying their products," the Court found no First Amendment violation because Massachusetts's display restriction was "an appropriately narrow means" of advancing the State's substantial interest "in preventing access to tobacco products by minors." *Id.* at 569. In particular, the Court emphasized that the restriction left open ample alternatives for advertising tobacco products, including leaving "empty tobacco packaging on open display." *Id.* at 570.

CRN's challenges to the district court's tailoring analysis miss the mark. To start, there is no merit to CRN's contention (Br. at 43) that GBL § 391-oo is overbroad because the statute's reach purportedly "goes far beyond" protecting the health of minors. CRN appears to complain that the definition of "[d]ietary supplements for weight loss or muscle building," *id.* § 391-oo(1)(a), could potentially be construed to prohibit the sale to minors of a "children's multivitamin" that claims to "help[] sustain strong muscles." Br. at 43. But CRN's own view as to how the law may be applied in one hypothetical scenario falls far short of demonstrating that the sales restriction "burden[s] substantially more speech than is necessary," *Clear Channel*, 594 F.3d at 104 (quotation marks omitted), particularly when CRN does not contend that manufacturers have a First Amendment right to sell children's multivitamins to children—the only conduct that would be barred under CRN's strained reading of the statute.

"[E]ven if there are marginal applications" where the sales restriction "would infringe on First Amendment values," the Supreme Court has long cautioned that "facial invalidation is inappropriate" where the "remainder of the statute covers a whole range of easily identifiable and constitutional proscribable conduct." *Parker v. Levy*, 417

43

U.S. 733, 760 (1974) (quotation marks and alterations omitted). A plaintiff must establish that "a substantial number of [the law's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024) (quotation marks omitted). Here, the constitutional applications are legion. (*See, e.g.*, JA-115–121 (depicting products, sold by CRN's members, that clearly constitute supplements for weight loss or muscle building).

CRN is further incorrect that the sales restriction is unconstitutional because a predecessor bill to GBL § 391-oo, which proposed to age-restrict a static list of products and ingredients, would have "address[ed] the same government interest without targeting speech." *See* Br. at 43. As a threshold matter, the Supreme Court has long held that *Central Hudson* does not require that "that there be no conceivable alternative" to the government's approach, *Fox*, 492 U.S. at 478, or that the regulation be "the least restrictive means" of advancing the State' interest, *id.* at 480. The "fit" inquiry instead turns on whether the State's regulation is "reasonable." *Id.* Thus, CRN is wrong that "[t]he very existence of the Predecessor Bill" supports invalidation of the State's chosen approach. *See* Br. at 44.

44

In any event, both the Supreme Court and this Court have recognized that the fourth prong of the *Central Hudson* is satisfied where the proffered alternative is less effective at furthering the asserted state interest. *See United States v. Edge Broad. Co.*, 509 U.S. 418, 430 (1993); *Caronia*, 703 F.3d at 168. The State has amply demonstrated why that is the case here. In vetoing the predecessor bill, Governor Hochul explained that age-restricting a static list of products or ingredients is not a viable approach because DOH is ill-equipped to "analyze ingredients used in countless products, a role that is traditionally played by the FDA." Veto Message to A. 431-C, *supra*. The Legislature likewise concluded that identifying weight-loss and muscle-building supplements by their labeling, packaging, and retail placement is more effective than "relying on a list of covered ingredients" because "the industry" can easily "work around" a static list. (JA-94.)

The Legislature's conclusion makes sense. A static list is less effective at capturing the universe of harmful weight-loss and muscle-building supplements because new products often come to market and manufacturers can simply rebrand old ones. Moreover, studies have repeatedly confirmed that many weight-loss and muscle-building supple-

ments contain unlisted ingredients. Accordingly, the Legislature reason-ably determined that relying on manufacturers' and retailers' own descriptions of the intended purpose of a supplement would more effec-tively identify and cabin the scope of age-restricted products.

## C.   Plaintiff's Challenge to the Statute's Age Verification Requirement Is Unpreserved and Unavailing.

Finally, CRN's argument (Br. at 44-46) that GBL § 391-oo's age verification requirement unlawfully compels its members to endorse the State's message about dietary supplements is unpreserved and wholly unavailing. CRN never alleged a compelled speech claim in its complaint (*see* JA-162–164)—despite having an opportunity to amend—so that claim is not properly before this Court.[7] *See Doherty v. Bice*, 101 F.4th 169, 175 (2d Cir. 2024) (plaintiff "cannot will his way into a complaint that he did not file, and he certainly cannot amend his complaint on appeal").

In any event, the statute's age verification requirement does not compel CRN's members to speak any message at all, let alone say that

---

[7] The fact that the district court asked for supplemental briefing on the issue of whether age verification is a form of compelled speech (*see* Hr'g Tr. at 37 (Apr. 10, 2024), ECF No. 50) has no bearing on whether CRN can seek a preliminary injunction based on a claim it never pleaded.

an age-restricted dietary supplement "is unsafe for minors," Br. at 44 (emphasis omitted). The statute instead makes clear that a retailer's obligation is to "require proof of legal age for purchase of such products." GBL § 391-oo(2). And the law further sets forth a series of actions that retailers may take to obtain such proof, such as performing "a transaction scan," *id.* § 391-oo(3), and using a method of shipping that requires an adult "to sign to accept delivery," *id.* § 391-oo(4). Any speech in furtherance of complying with the age verification requirement is clearly incidental to the act of verifying a customer's age and likewise lacks any expressive value to suggest that the seller agrees with the policy justifications for the restriction itself.

Even if the Court were to conclude otherwise, the applicable test governing compelled commercial disclosures is the one set forth in *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985)—not strict scrutiny, as CRN wrongly argues, Br. at 45. Under that test, a regulation that requires providers of commercial services to disclose "factual, uncontroversial information" about the terms under which their "services will be available" need only be reasonably related to an appropriate governmental interest and not unduly burden speech. *See Zauderer*, 471

47

U.S. at 650-51; *see also National Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 768 (2018).

Here, the age verification requirement at most requires sellers to disclose that a product is age-restricted and that a valid form of identification is required to purchase it. That information plainly constitutes a "factual" and "uncontroversial" statement that informs buyers of the terms under which a seller's "services will be available." *See Zauderer*, 471 U.S. at 651. Moreover, the State's age verification requirement is wholly in service of enforcing the State's restriction on the purchase of weight-loss and muscle-building supplements by minors—a restriction that directly advances a substantial state interest. See *supra* at 31-40. Finally, any speech burden is minimal. Age verification requirements for regulated products are commonplace, and none have been invalidated on First Amendment grounds, even where the regulation expressly requires retailers to post a notice announcing the restriction.[8]

---

[8] *See, e.g.*, 21 U.S.C. § 830(e)(1)(A) (age verification requirements for sale of pseudoephedrine); N.Y. Alco. Bev. Cont. Law § 65(6)(a) (same, for alcohol); *id.* § 65-d(1) (notice requirements for alcohol); N.Y. Pub. Health Law § 1399-cc(2) (same, for tobacco).

## POINT II

### PLAINTIFF'S APPEAL FROM THE DENIAL OF A PRELIMINARY INJUNCTION BASED ON ITS DISMISSED CONSTITUTIONAL CLAIMS IS MOOT AND MERITLESS

CRN also challenges (Br. at 44 n.13, 46-56) the district court's conclusion that CRN is unlikely to succeed on the merits of its claims that the statute is unconstitutionally vague, preempted by federal law, and in excess of the State's police powers. This portion of CRN's appeal is moot because the district court has dismissed each of these claims in the underlying action. *See Council for Responsible Nutrition*, 2024 WL 2137834, at *3-4. CRN cannot obtain a preliminary injunction based on dismissed claims, nor can it convert an appeal from the denial of a preliminary injunction into an otherwise impermissible interlocutory appeal of the partial dismissal of its amended complaint. In any event, the district court's analysis of CRN's failure to show a likelihood of success on the merits of these claims is correct.

### A. Plaintiff's Appeal Is Moot with Respect to the Denial of Preliminary Injunctive Relief Based on Claims That Were Subsequently Dismissed.

This Court has routinely held that an appeal from the denial of a preliminary injunction is mooted by the district court's dismissal of the

49

underlying claims. *See Ruby v. Pan Am. World Airways, Inc.*, 360 F.2d 691, 691-92 (2d Cir. 1966) (per curiam) (dismissing appeal from denial of preliminary injunction as moot where underlying complaint was dismissed); *K.M. v. Adams*, No. 20-4128, 2022 WL 4352040, at *3 (2d Cir. Aug. 31, 2022) (same); *Pierce v. Woldenberg*, 498 F. App'x 96, 97-98 (2d Cir. 2012) (same). Accordingly, the portions of CRN's appeal that are premised on its (now-dismissed) vagueness, preemption, and police powers claims are moot, and this Court should decline to reach their merits here.

CRN's arguments are improper for another reason too: by asking this Court to review the merits of claims that the district court has already dismissed, CRN is effectively mounting an impermissible collateral attack on the dismissal of these claims. But this Court lacks jurisdiction to review the partial dismissal of a complaint. *See Citizens Accord, Inc. v. Town of Rochester*, 235 F.3d 126, 128 (2d Cir. 2000) (per curiam) (Court's jurisdiction under 28 U.S.C. § 1291 extends only to a "'final' judgment or order . . . that conclusively determines the pending claims of all the parties in the litigation"). The Court should not permit CRN to short-circuit the ordinary appellate process, especially when

50

CRN will have ample opportunity to raise these same issues in an appeal from the entry of final judgment.

## B. The District Court Correctly Concluded That Plaintiff Is Unlikely to Succeed on the Merits of Its Now-Dismissed Constitutional Claims.

Alternatively, this Court may affirm the district court's denial of a preliminary injunction because the district court correctly found that CRN failed to demonstrate a likelihood of success on its other constitutional challenges.

### 1. New York's restriction on the sale of weight-loss and muscle-building supplements to minors is not unconstitutionally vague.

Because GBL § 391-oo does not implicate the First Amendment (see *supra* at 22-30), the district court correctly held (JA-193) that CRN must establish the "law is impermissibly vague in all of its applications" in order to succeed on its facial vagueness challenge. *See Village of Hoffman Ests.*, 455 U.S. at 497. CRN does not attempt to (and cannot) make that showing here. The law fully complies with the due process standards, in any event.

51

A statute is void for vagueness where it fails to provide "people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Thibodeau v. Portuondo*, 486 F.3d 61, 65-66 (2d Cir. 2007) (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)). The doctrine "does not require meticulous specificity from every statute, as language is necessarily  marked by a degree of imprecision." *Id.* at 66 (citation and quotation marks omitted). Rather, to satisfy due process, a law must simply provide "fair notice" of the prohibited conduct, *id.* at 65, and contain "minimal guidelines to govern law enforcement," *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (quotation marks omitted).

GBL § 391-oo fully satisfies both of these criteria. The plain text of the statute clearly sets forth the prohibited conduct: the sale of "an over-the-counter diet pill or dietary supplement for weight loss or muscle building within [New York] to any person under eighteen years of age." GBL § 391-oo(2). And the statute specifically defines what dietary supplements are subject to the sales restriction: any that are "labeled, marketed, or otherwise represented for the purpose of achieving weight loss or muscle building." *Id.* § 391-oo(1)(a).

52

Notably, GBL § 391-oo sets forth several guidelines for determining whether a product falls within this category. *See id.* § 391-oo(6). Under these guidelines, a dietary supplement comes within the sales restriction if the manufacturer's packaging, statements, or marketing of the product identifies the supplement as aiding weight loss or muscle building by, for example, stating or suggesting that the product will "modify, maintain, or reduce body weight, fat, appetite, overall metabolism," or will "maintain or increase muscle strength." *Id.* § 391-oo(6)(b)(i)-(ii). Retailers may also bring a dietary supplement within the scope of the sales restriction—irrespective of the manufacturer's labeling or marketing of the product—by grouping the product with other weight-loss or muscle-building supplements through in-store displays or online categorization of products. *Id.* § 391-oo(6)(d)(i)-(ii). And a dietary supplement may be subject to the sales restriction if it contains certain enumerated ingredients that are commonly associated with weight loss or muscle building, such as steroids and creatine. *Id.* § 391-oo(6)(a)(i)-(iii).

Taken together, these detailed terms give individuals and businesses ample notice of the core conduct that the law prohibits. And they provide

53

equally clear guidelines for cabining the Attorney General's discretion in enforcement. CRN's contrary arguments fall flat.

*First*, CRN chiefly argues that the restriction on the sale of dietary supplements that are "labeled, marketed, or otherwise represented for the purpose of achieving weight loss or muscle building," *id.* § 391-oo(1)(a), is impermissibly vague because the term, "otherwise represented," is "susceptible to any number of meanings," Br. at 51, and may be construed to encompass third-party statements and actions, *see id.* at 50, 53-54.[9] Neither of these assertions has merit. The plain meaning of "represent" is clear: "to describe as having a specified character or quality." *Represent*, *Merriam-Webster's Collegiate Dictionary* 1057 (11th ed. 2003). And that term in fact appears in the FDCA's definition of "dietary supplement" itself, which excludes products "represented for use as a conventional

---

[9] CRN also argues (Br. at 50) that the restriction is vague because other "key phrases" in the statute are undefined. But CRN fails to cite any other term that it purportedly does not understand. Nor is the statute impermissibly vague simply because it fails to define some terms, since courts (and regulated parties) are presumed to understand words by reference to their "ordinary or natural meaning," *Smith v. United States*, 508 U.S. 223, 228 (1993); *see People v. Aleynikov*, 31 N.Y.3d 383, 397 (2018) ("When a word in a statute is not defined in the statute, dictionary definitions serve as useful guideposts." (quotation marks omitted)).

food." *See* 21 U.S.C. § 321(ff)(2)(B). Thus, even absent a formal statutory definition, "represented" has a sufficiently clear meaning in light of its ordinary and settled usage.

There is likewise no basis to construe "otherwise represented" to embrace actions or statements by unrelated third parties. This proposed reading contravenes settled doctrines of statutory interpretation. Courts must interpret a term in light of its surrounding text to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth." *Yates v. United States*, 574 U.S. 528, 543 (2015) (quotation marks omitted). Here, the term "represented" directly follows "marketed," which the Supreme Court has held is "transparently clear" and refers to a "retailer's intentional display and marketing of merchandise." *See Village of Hoffman Ests.*, 455 U.S. at 502 (interpreting meaning of "marketed for use" in sales ordinance). Moreover, the statutory guidelines refer clearly to the actions and statements by manufacturers and retailers—not third parties. See *supra* at 53.

To the extent there is any ambiguity, basic canons of statutory construction confirm that the Court should adopt the State's proffered

interpretation over CRN's expansive and atextual reading. "In evaluating a facial challenge to a state law, a federal court must, of course, consider any limiting construction that a state court or enforcement agency has proffered." *Kolender*, 461 U.S. at 355 (quotation marks omitted). Doing so is particularly appropriate where the proffered reading would avoid constitutional problems. *See 1256 Hertel Ave. Assocs., LLC v. Calloway*, 761 F.3d 252, 260-61 (2d Cir. 2014). Here, construing the sales restriction to apply based on manufacturers' and retailers' own actions and statements—rather than the representations of unrelated and unknown third parties—defeats CRN's principal concern about the statute's vagueness and is plainly in accord with its plain text.

*Second*, CRN is wrong that GBL § 391-oo provides the Attorney General unfettered discretion to determine "what types of labeling, marketing or other[] representations subject a product to the Act." Br. at 53. CRN's fears of arbitrary enforcement appear to chiefly stem from its incorrect view that the sales restriction may be triggered by "third party statements." *See id*. But the statutory guidelines—though non-exhaustive—clearly delineate the kinds of actions and representations that bring a product within the scope of GBL § 391-oo's sales restriction. See

56

*supra* at 53. The statute is thus different in kind from the ones cited by CRN (Br. at 54), which invite arbitrary enforcement because they lack any applicable standard or afford law enforcement complete discretion in enforcement. *See, e.g.*, *City of Chicago v. Morales*, 527 U.S. 41, 66 (1999); *Kolender*, 461 U.S. at 358.

*Third*, CRN fundamentally misses the mark (Br. at 52-53) in nitpicking purported imprecisions in the statutory guidelines. The Supreme Court has cautioned against demanding such "meticulous specificity" and has instead emphasized that a statute passes constitutional muster if its words "are marked by flexibility and reasonable breadth." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) (quotation marks omitted).

CRN fails to identify any guideline here that is actually "limitless" or contradictory. *Cf.* Br. at 52-53. CRN appears to take issue with the statute's requirement that courts consider whether a product's "labeling or marketing bears statements or images that express or imply that the product will help" achieve certain effects associated with weight loss, such reducing "body weight" or modifying "overall metabolism," GBL § 391-oo(6)(b). But that guideline is reasonably clear. The "express or

57

imply" language appears in the FDA's own labeling regulations. *See, e.g.*, 21 C.F.R. § 101.18(c) (regulating "any representation that expresses or implies a geographical origin"). And in this context, it clearly provides that a product is subject to the age restriction if its packaging or advertising directly states or suggests that the product will affect the body in a way that aids weight loss—for example, the product, "Carb Blocker" (*see* JA-121), has a name that clearly implies that it will "modify . . . the process by which nutrients are metabolized," GBL § 391-oo(6)(b)(i), to help users lose weight.

CRN cannot attack the "flexibility and reasonable breadth," *Grayned*, 408 U.S. at 110 (quotation marks omitted), of the guidelines by resorting to speculation about hypothetical, niche applications not before the Court. *See* Br. at 50 (speculating about application to "endcap display with exercise equipment"); *id.* at 52 (same, for "social media placement"). Laws are "not impermissibly vague simply because" there are debatable "marginal cases." *United States v. Sun & Sand Imps., Ltd.*, 725 F.2d 184, 187 (2d Cir. 1984). The proper standard requires fair notice and minimal standards for enforcement, and GBL § 391-oo amply clears this threshold.

### 2. New York's sales restriction is not preempted by federal law governing product labeling.

Where, as here, a challenged state law regulates a matter of health and safety, the Court must "start with the assumption that the historic police powers of the States" are not superseded "unless that was the clear and manifest purpose of Congress." *New York State Rest. Ass'n v. New York City Bd. of Health*, 556 F.3d 114, 123 (2d Cir. 2009) (quoting *United States v. Locke*, 529 U.S. 89, 107 (2000)).

Against this backdrop, there is no basis to find that the FDCA expressly or impliedly preempts New York's sales restriction. To determine whether a federal statute expressly preempts state law, courts must "focus on the plain wording of the [statute], which necessarily contains the best evidence of Congress'[s] preemptive intent." *Chamber of Com. of U.S. v. Whiting*, 563 US. 582, 594 (2011) (quotation marks omitted). Here, the express preemption provision on which CRN relies (*see* Br. at 56) proscribes only state requirements "respecting any claim" about nutrient levels or health benefits "made in the label or labeling of food that is not identical to the requirements set forth in [21 U.S.C. §] 343(r)." *See* 21 U.S.C. § 343-1(a)(5). The plain text thus forecloses CRN's express preemption claim. As explained above (at 23), GBL § 391-oo in no way

59

restricts what claims dietary supplement manufacturers may make about their products. The law instead imposes an age restriction on the sale of dietary supplements that claim to aid weight loss or muscle building.

CRN misses the mark in characterizing this sales restriction as "an additional restriction on structure/function claims" that is expressly preempted by 21 U.S.C. § 343-1(a)(5). *See* Br. at 54. As its own cited cases confirm, the proper reading of 21 U.S.C. § 343-1(a)(5) preempts "state law that establishes *labeling requirements* for structure/function claims that are not identical" to requirements under the FDCA. *See Ferrari v. Vitamin Shoppe Indus. LLC*, 70 F.4th 64, 68 (1st Cir. 2023) (emphasis added); *see also DiCroce v. McNeil Nutritionals, LLC*, 82 F.4th 35, 41 n.5 (1st Cir. 2023) (applying same interpretation); *Dachauer v. NBTY, Inc.*, 913 F.3d 844, 847 (9th Cir. 2019) (same). The court in *Ferrari*, for example, held that the plaintiffs could not attack a manufacturer's structure/function claims as "false and misleading under state law" where the claims otherwise complied with the FDCA's requirements. *See Ferrari*, 70 F.4th at 69, 76-77. None of CRN's cited cases, however, involved a state sales restriction or suggested that such regulations constitute "further restric-

tions on labeling," *see* Br. at 55, that are properly subject to the FDCA's preemptive scope.

CRN's arguments about conflict preemption (*see* Br. at 54-56), are likewise unavailing. That doctrine applies where "compliance with both state and federal law is impossible, or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress*." Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015) (quotation marks omitted). Here, CRN does not argue impossibility. And it has not shown that the challenged sales restriction frustrates Congress's "purposes and objectives" in the FDCA or DSHEA. *See* Br. at 55.

Indeed, GBL § 391-oo does not purport to regulate the safety or labeling of dietary supplements at all, let alone do so in a way that impedes their access by the general population. Rather, the law restricts a limited segment of the population (minors) from purchasing a limited class of dietary supplements (weight-loss and muscle-building products) that are not recommended for use by children (*see* JA-100, 108 (warning by American Academy of Pediatrics; *see also* JA-116 (warning on product label by CRN member)). There is, accordingly, no conflict "so direct and positive" between state and federal law that they "cannot be reconciled

61

or consistently stand together." *See Marentette v. Abbott Lab'ys, Inc.*, 886 F.3d 112, 117 (2d Cir. 2018) (quotation marks omitted).

### 3. The State acted well within its police powers by restricting the sale of weight-loss and muscle-building supplements to minors.

To the extent CRN continues to press its argument that GBL § 391-oo exceeds the State's police powers—a point that it relegates to a single footnote, *see* Br. at 44 n.13—that argument is plainly wrong. CRN fails to specify what constitutional provision would be violated if the State were exceeding its police powers and, in any event, a challenge to the State's exercise of its police powers is subject only to rational basis review, *see Jacobson v. Massachusetts*, 197 U.S. 11, 35 (1905).

As the district court correctly concluded, GBL § 391-oo clearly satisfies rational basis review, as "preventing minors from directly purchasing certain dietary supplements is a rational means of reducing the unsupervised use of those products, often by youth who struggle with eating disorders." (*See* JA-191–192.)

## POINT III

### THE DISTRICT COURT CORRECTLY CONCLUDED THAT THE EQUITIES AND PUBLIC INTEREST ALSO WEIGH AGAINST GRANTING PRELIMINARY RELIEF

### A.  Plaintiff Cannot Prove Any Irreparable Harm.

The district court correctly concluded that CRN failed to establish that its members will suffer any irreparable harm absent preliminary relief. (*See* JA-194–196.) CRN asserts two forms of injury: an alleged violation of its members' First Amendment rights and their purported economic costs of complying with the statute. *See* Br. at 16-18, 56-58. Neither satisfies the requisite showing of irreparable harm.

To start, CRN's mere allegation that GBL § 391-oo "implicates" the First Amendment does not constitute irreparable harm. *See* Br. at 57. Although this Court has found the alleged impairment of First Amendment rights to be sufficient where the "statute in question indisputably requires [plaintiffs] to speak when they would rather not," *International Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 72 (2d Cir. 1996), GBL § 391-oo "neither limits what CRN sellers may say nor requires them to say anything" at all (JA-185 (quotation marks omitted)). Accordingly, CRN is not entitled to a presumption of irreparable harm based on its alleged

First Amendment injury and must instead "articulate a specific present objective harm or a threat of specific future harm." *Bronx Household of Faith*, 331 F.3d at 350 (quotation marks omitted).

CRN fails to do so. As explained above (at 21-48), CRN is unlikely to establish any violation of its First Amendment rights. And to the extent that CRN's members have elected to alter their product labels or refrain from making certain claims in an attempt to circumvent the sales restriction (*see* Br. at 16), that self-inflicted injury is not cognizable. *See* 11A Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2948.1 (3d ed., June 2024 update) (Westlaw) ("a party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted"); *cf. Molloy v. Metropolitan Transp. Auth.*, 94 F.3d 808, 813 (2d Cir. 1996) ("extra inconvenience" of pursuing alternative does not "rise to the level of irreparable harm").

CRN's asserted economic injuries (Br. 17-18, 58) fare no better. As an initial matter, the district court properly concluded that CRN's "substantial and inexcusable" delay in seeking preliminary relief "erodes its claims" that its members' purported economic costs are irreparable. (JA-195.) Indeed, courts have repeatedly declined to grant preliminary

relief in the face of such unwarranted delay. *See e.g.*, *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276-77 (2d Cir. 1985) (ten-week delay in filing suit); *Silber v. Barbara's Bakery, Inc.*, 950 F. Supp. 2d 432, 442-43 (E.D.N.Y. 2013) (four-month delay in seeking preliminary relief).[10] CRN argues that it waited five months after the law was enacted to file suit because it needed to "evaluat[e] how the law affected its members" (Br. at 57), but that explanation makes little sense given that CRN brought a facial challenge that does not turn on its members' individual circumstances.

In any event, this Court has long observed that "ordinary compliance costs are typically insufficient to constitute irreparable harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005). That is particularly the case here, when the bulk of CRN's alleged compliance costs—for example, the cost of analyzing the law's application to specific products and implementing age-verification procedures—have already been accrued

---

[10] *See also Coscarelli v. ESquared Hosp. LLC*, 364 F. Supp. 3d 207, 222 (S.D.N.Y. 2019) (observing that "courts in this Circuit typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months" and collecting cases (quotation marks omitted)).

and thus would not be averted by enjoining the enforcement of GBL § 391-oo during the pendency of this litigation.

## B.    The Balance of Equities and Public Interest Weigh Decisively Against Granting Preliminary Relief.

In contrast to CRN's and its members' self-inflicted censorship injuries and foregone compliance costs, the harms to the public interest of a preliminary injunction are grave. CRN seeks to enjoin enforcement of a duly enacted state statute that seeks to protect minors from the physical and mental health harms associated with the use of weight-loss and muscle-building supplements. And CRN seeks to upend these protections months after they have already gone into effect.

Moreover, "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (quotation and alteration marks omitted). A pre-enforcement injunction is particularly inappropriate where, as here, the plaintiff is requesting a federal court to facially enjoin enforcement of a state law before the State's courts have had the opportunity to interpret it. *See, e.g.*, *NetChoice, LLC v. Paxton*, 142 S. Ct. 1715, 1718 (2022) (Alito,

J., dissenting). These important public interests outweigh any potential, future harm to CRN and its members, particularly when the law has already been in effect for months.

## CONCLUSION

This Court should affirm the district court's denial of plaintiff's motion for a preliminary injunction.

Dated:  New York, New York
        August 7, 2024

                              Respectfully submitted,

                              LETITIA JAMES
                                *Attorney General*
                                *State of New York*
                              Attorney for Appellee


                        By:   */s/ Grace X. Zhou*
                              GRACE X. ZHOU
                              Assistant Solicitor General

BARBARA D. UNDERWOOD            28 Liberty Street
  *Solicitor General*          New York, NY 10005
ESTER MURDUKHAYEVA              (212) 416-6160
  *Deputy Solicitor General*
GRACE X. ZHOU
  *Assistant Solicitor General*
      *of Counsel*

67

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Emily Paule, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 13,008 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.


 /s/ *Emily Paule*